ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | CASE NO.    1:08CR47 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Judge John R. Adams |
| ANNTRINA COLLINS, | ) | |
| | ) | SENTENCING MEMORANDUM |
| Defendant. | ) | |
| | ) | |

## I.  Introduction

This matter is before the Court for the sentencing of the Defendant Anntrina Collins.   On May 27, 2008, Defendant was found guilty by a jury of two counts of making false statements in the acquisition of firearms and one count of unlawfully disposing of a firearm.   The Court ordered and received a pre-sentence investigation and Report related to the charges herein.   The Government has submitted several objections to the Report.   Those objections are addressed herein.

## II.  Advisory Guideline Calculations

As Defendant's conviction for violating 18 U.S.C. § 922(a)(6) embodies conduct that is treated as a specific offense characteristic, her three counts are grouped for this Guideline calculation.   The base offense level for violations of 18 U.S.C. § 922(a)(6) is Level 12.   A 2 level enhancement is appropriate as the acts herein involved between 3 and 7 firearms.[1]   Based on these facts, the base offense level is 14.   Defendant has no criminal history points and is therefore

---

[1] The Government's objection to this enhancement is addressed below.

placed in Criminal History Category I.  As such, the Report calculates the advisory guideline

range under these facts as 15 to 21 months imprisonment, 2 to 3 years of supervised release upon

completion, a fine, and the appropriate special assessment.

## III.  Objections

The Government has raised two objections to the Report.  The Court addresses each of

those objections in turn.

### A.   Number of Firearms

The Government contends that an examination of the Defendant's relevant conduct

supports a 4 level enhancement.   Specifically, the Government asserts that this Court should find

that 8 firearms were a part of the relevant conduct.   The Government reaches this conclusion as

follows:

> The defendant was convicted for the "straw purchase" of a total of 4 firearms.   She
> was acquitted for the straw purchase of 2 firearms.   Evidence admitted at trial also
> suggested that the defendant straw purchased 1 firearm in 2000.   The government
> also possessed evidence … that another firearm was purchased by Collins in 2001.

Doc. 40 at 1-2.   In support of its argument, the Government relies upon *U.S. v. Phillips*, 516 F.3d

479 (6th Cir. 2008).   *Phillips* provides in relevant part as follows:

> Phillips's 2002 and 2006 possessions of firearms may be added to his offense level
> as relevant conduct if these possessions were "part of the same course of conduct or
> common scheme or plan" as Phillips's underlying felon-in-possession
> conviction.FN4 U.S.S.G. § 1B1.3(a)(2).   "For two or more offenses to constitute
> part of a common scheme or plan, they must be substantially connected to each
> other by at least one common factor, such as common victims, common
> accomplices, common purpose, or similar modus operandi." U.S.S.G. § 1B1.3,
> application note 9(A). If this criteria is not met, Phillips's prior possessions of
> firearms may nevertheless be counted as relevant conduct if they were part of the
> same course of conduct.   "Offenses that do not qualify as part of a common
> scheme or plan may nonetheless qualify as part of the same course of conduct if
> they are sufficiently connected or related to each other as to warrant the conclusion

> that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G.
> § 1 B 1.3, application note 9(B).

*Id.* at 483.  The Court then analyzed the temporal proximity aspect of relevant conduct.  In so

doing, the Court cited prior precedent and noted:

> We have addressed the applicability of the relevant conduct enhancement most
> commonly in the drug context. In *Hill*, 79 F.3d at 1484-85, we concluded that an
> isolated drug transaction nineteen months before the transaction for which the
> defendant was indicted could not be considered relevant conduct. Applying the
> factors identified in application note 9 to U.S.S.G. § 1 B 1.3, we first noted that
> "temporal proximity is extremely weak in that nineteen months is an exceedingly
> long lapse between offenses."  *Id.* at 1484.

*Id.* at 484.  In the instant matter, the Government seeks to use conduct even further removed.

The Government seeks to use conduct that occurred in 2000 and 2001, while the convictions arise

from conduct occurring in October of 2005.

The Court acknowledges that other factors have been presented herein.   The prior conduct

is nearly identical to the crimes for which Defendant was convicted.   It involved the same modus

operandi and on one occasion involved the same party, a convicted felon, Richard Gunter.

However, the 2001 incident involved Collins purchasing a firearm and that firearm never being

recovered.   As such, the Government effectively asks the Court to infer that a crime took place

with respect to that weapon.  Given the substantial temporal gap between that event and this

conviction, the Court is not inclined to make such an inference.   Consequently, the Court

overrules the Government's request for a 4 level enhancement.

## B.  Use of Acquitted Conduct

The Government next requests that the Court enhance Defendant's sentence using the

conduct for which Defendant was charged but ultimately acquitted in Count 2 of the indictment.

The Court acknowledges that the current precedent in this Circuit permits the use of acquitted conduct when imposing sentence.   The Court also acknowledges that the acquitted conduct issue is presently pending before the Circuit Court *en banc*.   Given the Court's analysis of the § 3553 factors, the Court finds that considering acquitted conduct in this matter is unnecessary and declines to consider such conduct in this matter.

### C.  Advisory Guidelines Conclusion

Having rejected each of the Government's objections, the Court adopts the Report's initial determination of the advisory guideline range.   Prior to any departure or variance, therefore, the guideline range is 15-21 months.

## IV.  Departure and Variance

### A.  Departure

There are no grounds for a departure in this matter, and the Court therefore declines to depart.

### B.  Variance

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in exercising its judgment to determine an appropriate sentence and must offer a reasoned explanation for the sentence.   Based upon those factors, the Court finds than an upward variance is appropriate under the facts presented in this matter.

In reaching its conclusion, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant.   The Court must also review the need for the sentence imposed: a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; b) to afford adequate deterrence to criminal

conduct and to protect the public from further crimes of the Defendant; and c) to provide the Defendant with needed educational or vocational training, medical care, and/or other correctional treatment in the most effective manner.

### 1.    Nature and Circumstances of the Offense

On June 23, 2007, Ronald Gunter was pulled over for violating traffic laws.   His vehicle was inventoried and Taurus, Model PT-111, .9 mm Pistol, Serial # TXH13225 was located.   Due to Gunter's status as a convicted felon, an investigation was launched into the origin of the firearm. That investigation revealed that the weapon had been purchased by Defendant at a gun show on October 23, 2005.   Defendant admitted to ATF agents that Gunter accompanied her to the gun show and admitted that she knew that Gunter was a convicted felon.

During further questioning, Defendant conceded that she had filled out the purchase applications for the firearms and had passed the background check without incident.   Defendant stated that she had purchased two guns on that day along with ammunition, spending between $200 and $300.   Defendant was uncertain, but she believed she had purchased a .22 and a .38 on the day in question.   She told agents that one gun was kept in her garage and one was kept in her home.

During interviewing, Collins admitted to also purchasing a Hi-Point firearm that she gave to Gunter during November of 2005.   ATF agents also informed Defendant that the Hi-Point, .9 mm Pistol, Serial #012933, she had purchased had been recovered in crime that occurred a mere 27 days after the gun was purchased.   Through additional questioning, agents also learned that Defendant had purchased a Hi-Point .9mm Pistol on January 23, 2000.   On February 13, 2000, Gunter was arrested with that pistol in his possession.

Following even more questioning, Defendant admitted to purchasing three AK-47, semi-automatic assault rifles.  To date, the whereabouts of these assault rifles are unknown. Moreover, agents later learned that one of the firearms purchased by Defendant on October 23, 2005 was used in a violent crime that led to charges of attempted murder and felonious assaults.

Defendant's numerous purchases and transfers of these firearms led to her convictions.[2]

## 2.  History and Characteristics of the Defendant

Defendant is a thirty-four year female.   She is a single mother of four children, ages 17, 13, 9, and 7.   In 2004, she received an Associate's Degree in Applied Business, Administrative Assistance.   In 2007, Defendant received a Bachelor's Degree in Business Administration. From June 2006 to the present, Defendant has been employed as a medical secretary, earning $10 per hour.   Prior to her convictions herein, Defendant had no prior arrests or convictions.

There are, however, two sets of facts which are particularly troubling and disheartening to the Court.   At first blush upon reviewing the Defendant's personal history, one would think she should serve as an example to others.   She is a young mother with four children by two different fathers.   It appears that the fathers provide little to no support for the children.   Despite this fact, Defendant has worked her way through school and obtained both an Associate's degree and a Bachelor's degree.   Despite the demands accompanying parenting four children, Defendant obtained these degrees while maintaining gainful employment.   Accordingly, many would view Defendant as a success story.

It is these very same facts, however, that trouble the Court.   Despite her apparent work

---

[2] Consistent with the above, the Court has not considered the prior purchases and transfers from 2000 and 2001 in computing the advisory guidelines, but has rather considered these facts under the § 3553 factors when reaching its sentence.

ethic and her education, Defendant has chosen, apparently on several occasions, to provide firearms to convicted felons.   Defendant seems to ignore that her actions place her own children at risk, as it is often innocent children that die at the hands of those who illegally obtain a firearm.

The Court is also troubled by the testimony given by Defendant during the trial in this matter.   At one point, Defendant asserted that she used the proceeds of student loans to purchase the roughly $1,200 worth of firearms as "investments."   Included in these "investments" were three assault rifles, firearms which serve no sporting purpose and are primarily used in criminal activity.   Defendant then explained that she permitted Gunter to possess one of the guns solely for the purpose of selling the gun for Christmas money.   The pistol that Defendant permitted Gunter to possess is substantially similar to the pistol she had purchased in 2000 that was found in Gunter's possession just weeks after its purchase.   The pistol is also similar to that which Defendant purchased and which was later used in a violent felony.   Furthermore, the Court is aware that both the assault rifle and the type of pistols purchased by Defendant are prominent among the criminals residing in this area.

It is beyond belief that Defendant spent more than one thousand dollars on guns in October and then decided almost immediately to sell one of the guns for Christmas money.   Furthermore, given Defendant's admissions that she knows very little about firearms, it would be odd indeed that these weapons would be her choice as an investment vehicle.   As such, the Court finds that Defendant's testimony was less than forthright.

Additionally, as a condition of placing the Defendant out on bond pending sentencing, the Court ordered a search of Defendant's resident.   During that search, ammunition was found.   Specifically, 44 live rounds of PMC .45 caliber ammunition was found in a second floor bedroom.

7

This ammunition, based on its type, was clearly in addition to the ammunition purchased on the same day the weapons were obtained.   This fact is particularly troubling for two reasons.[3]   First, if Defendant purchases guns solely as investments, she would have no reason to own live ammunition.   Second, the ammunition found does not match any of the firearms that Defendant was known to purchase.   Accordingly, Defendant has either purchased ammunition for a gun she never owned or has possessed guns that the Government is unaware she had purchased.

Despite her efforts at self-improvement, Defendant has repeatedly decided to violate the law by placing firearms in the hands of felons.   She is one step removed in the chain of events that led to felonious assault and attempted murder charges.   That is to say nothing of the three AK-47 assault rifles that Defendant purchased that have now disappeared into the hands of an unknown persons.   Given the nature of those weapons, it takes little imagination to believe that they have been or will be used in illegal acts in the near future.

**3.  The need for the sentence imposed to reflect the seriousness of the offense**

The Court cannot overstate the seriousness of Defendant's offenses.   Given the evidence before the Court, it is apparent that Defendant has routinely purchased weapons for others who could not legally purchase them.   To see the serious nature of this crime, one need only review recent local newspaper headlines.

On June 14, 2008, an AK-47, similar to those that were purchased by Defendant, was used in a deadly robbery in Elyria.[4]   During that robbery, the employee was described as doing

---

[3]  Again, the Court cannot overstate the dangerous nature of having that amount of live ammunition in a home with children as young as 9.

[4]  Brad Dicken, *Suspect took $12,000, then killed woman with AK-47, prosecutors say*, The Chronicle Telegram, June 26, 2008, available at www.chroniclet.com (last visited on June 26, 2008, also on file with the Court).

"everything she was supposed to in a robbery[.]"  Despite those efforts, she was shot in an execution-style murder.  Just recently in *U.S. v. Taylor*, 1:08CR163, this Court sentenced two defendants for armed robbery.  Those defendants committed their robbery using an AK-47 and admitted to purchasing that firearm on the streets of Cleveland.  Closed-circuit surveillance cameras captured a photograph demonstrating the intimidating nature and size of such a weapon. That photograph is attached hereto as Exhibit 1.  While these crimes were being committed with AK-47s, the whereabouts of the three AK-47 assault rifles purchased by Defendant remain unknown.  The Court finds that Defendant's denial of knowledge about the location of these assault rifles is disingenuous.   It is beyond belief that a single mother of four children would bring four such rifles into her home and be so unaware of their location that she did not know that they had been moved from her garage.

An October article from 2007 indicates that ten juveniles died from firearms in the Cleveland area along that year.   All but one of those children had no involvement in crime, merely victims of circumstance.[5]  Yet another article details the killing of an innocent 18-year old when two other teenagers shot at one another.[6]   In fact, the murder rate in the city of Cleveland reached a 13-year high in 2007.

Beyond these local statistics are staggering national statistics.  According to the U.S. Government's Center for Disease Control and Prevention, 2,852 children and teens were killed by firearms in 2004.  That number includes 46 such deaths in the state of Ohio.  An additional 13,846 children and teens were injured by firearms during 2004.

---

[5] Joe Frolik, *Why? And what now?,* The Plain Dealer, Oct. 7, 2007, at M1 (also on file with the Court).
[6] Mark Puente, *Innocent twin, 18, killed*, The Plain Dealer, Sept. 6, 2008, at B1 (also on file with the Court).

That, of course, is not to say that the Defendant is responsible for each of these crimes. However, one of the guns purchased by the Defendant and provided to others was used in a crime that resulted in charges of felonious assault and attempted murder.   As such, there is no question that Defendant is a contributor to the types of statistics detailed above.

4. **The need for the sentence imposed to afford adequate deterrence and to protect the public**

Based on the above, the Court has determined that a penalty above the advisory guideline range is necessary to deter the Defendant and protect the public.  As noted above, Defendant placed herself in a situation in life from which she could succeed.   However, she repeatedly and over the court of several years chose to take an easier route by purchasing firearms for felons.   It is unclear what benefit Defendant received from these purchases.   Whether she received a monetary benefit or purchased the firearms based on some misplaced sense of loyalty to the father of her children, however, is irrelevant.   Whatever her reasons, Defendant's actions placed children, including her own, and others throughout her community in serious danger.   From her testimony during trial, it is apparent that Defendant fails entirely to recognize the seriousness of her offense. She appears to believe that she did little more than place her name on an application instead of placing the name of the true owner thereon.   She apparently fails to recognize that all actions have consequences.   There is at least one known victim as a result of Defendant purchasing firearms for felons.   As demonstrated by the attempted murder charges in that matter, the consequences of Defendant's actions are significantly heightened because firearms are involved.   Accordingly, a significant period of incarceration is necessary to compel Defendant to recognize the seriousness of her crimes.

10

Moreover, a simple scanning of the daily newspaper reveals that a period of incarceration is necessary to protect the public.  Defendant purchased at a minimum 4 firearms, while the Government has presented evidence that the number of firearms could be as high as 8.  Even that higher number does not include the firearm that matches the ammunition found in Defendant's home.  Using even the smaller number of 4 firearms, Defendant has significantly increased the ability of others to commit violent crimes.  More specifically, Defendant has placed three AK-47 semi-automatic assault rifles on to the streets of Cleveland.  In the Court's experience, these weapons in the wrong hands are used for one purpose and one purpose only:  to commit violent crime.  As such, the Court finds that an upward variance is necessary to fulfill the purposes of sentencing.

In reaching this conclusion, the Court is cognizant of the fact that the crimes at issue are difficult to prosecute.  As many Court's have recognized with juries, there is likewise a "CSI effect" among criminals.  Having witnessed on television the procedures used by law enforcement to track weapons, felons now routinely file off the serial numbers from weapons, leaving their origins impossible to trace.  Through happenstance in this matter, the gun used in a violent felony was able to be traced back to Defendant.  Consequently, the matter was able to proceed to trial and the person assisting criminals in obtaining firearms was identified.  As these convictions are increasingly difficult to obtain, it is all the more important to hand down a sentence that will deter others, despite their belief that they will not be apprehended.

Finally, the Court pauses to note that it has considered that Defendant is a first-time offender.  A life without prior convictions, however, does not grant Defendant a free pass.  While her convictions may not be labeled "violent crimes," they are directly tied to violent crimes.  In

2006, 68% of all murders were committed with a firearm, and 42% of all robberies and 22% of all aggravated assaults involved firearms.   Furthermore, as the Government aptly stated during sentencing, one of the guns purchased by Defendant was in fact used in a violent crime; a crime that resulted in one person being shot and severely injured.   Consequently, Defendant's first-time offender status does little to mitigate her crimes.

###### 5.  Defendant's request for a downward variance

Based on the above, it is apparent that the Court has rejected Defendant's argument for a downward variance.   However, the Court will specifically address Defendant's argument for the sake of clarity.

During sentencing, Defendant urged that a downward variance was warranted because a sentence of incarceration would severely disrupt the lives of her children.   Defendant is correct that a prison sentence will drastically reduce the time she has with her children.   However, the mothers of the crime victims detailed above lost their children forever.   Moreover, unlike Defendant, those mothers were innocent.   They had committed no crimes, yet permanently lost their children.   In stark contrast, Defendant willfully provided dangerous firearms to felons – firearms that could easily land in the hands of someone who could hurt Defendant's own children. Moreover, as detailed above, Defendant brought loaded weapons, including assault rifles, into her children's home.   For that matter, if Defendant is to be believed, she was so nonchalant about having the weapons in her home, she failed to monitor them in any manner.   As a result, the Court finds no basis for a downward departure.

## V.  Kinds of Sentences Available

The final calculated advisory guideline range of imprisonment is 15 to 21 months.   The

maximum statutory penalty for each count is 10 years imprisonment, a $250,000 fine, and 3 years of supervised release.

## VI.  Conclusion

Based upon the above reasoning, pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. § 3553, it is the judgment of the Court that the Defendant Anntrina Collins is hereby committed to the Bureau of Prisons for a term of 48 months.

The Court declines to impose a fine on Defendant, but she must pay to the United States a special assessment of $300, which shall be due immediately.

The Court notes that the Report recommended a sentence of 15 months.   Based upon the Court's review of the facts of this matter, such a sentence is simply too low.   While the penalty imposed by the Court is higher than that recommended by the Report, the Court does not deem the penalty to be imposed harsh.   Whenever one speaks of restricting gun rights, the immediate response is that the result will be that only criminals will have guns if such restrictions are put in place.   Unfortunately, it appears that even with regulations, guns will inevitably end up in the hands of criminals due to persons like Defendant circumventing the existing restrictions. Accordingly, the Court has determined that 48 months is sufficient, but not greater than necessary, to fulfill the purposes of sentencing.[7]

IT IS SO ORDERED.


____September 9, 2008____          ____/s/John R. Adams_____
Date                              JOHN R. ADAMS
                                  UNITED STATES DISTRICT JUDGE

---

7 The Court notes that despite this increase from the Report's recommendation, the ultimate sentence imposed by the Court is less than half of the statutory maximum permitted for the crimes at issue.